UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Private Jet Services Group, LLC,
        Plaintiff

        v.                                    Case No. 20-cv-1015-SM
                                              Opinion No. 2022 DNH 123

Tauck, Inc.,
        Defendants

**O R D E R**

Private Jet Services Group ("PJS") is a New Hampshire-based private aircraft booking agent.  It brings this breach-of-contract action against Tauck, Inc., a Connecticut-based provider of high-end domestic and international guided tours. In general, the parties' contracts contemplated that PJS would arrange for, and Tauck would use, a dedicated aircraft to conduct a minimum of fifty (50) tours of New Zealand per season. PJS alleges that Tauck breached those contracts in each of two seasons.  First, during the 2019 tour season, PJS says Tauck employed its services for only 48 tours – two fewer than the parties' agreed-upon minimum.  Next, PJS says Tauck breached the parties' agreements during the 2020 tour season by using PJS's services for only 23 tours – 27 fewer that the 50 tour seasonal minimum.  PJS claims that it is owed roughly $265,000 in damages

for the 2019 tour season and nearly $1.7 million in damages for the 2020 season.

Tauck denies that it breached either of the parties' contracts and says that it is excused from performing under those contracts, either because PJS breached first, or because its performance was rendered impossible by external events. With respect to the 2019 season, Tauck blames PJS for having failed to provide the agreed-upon aircraft for the first eight tours, and says that failure amounts to a material breach.  With respect to the 2020 season, Tauck says the global COVID-19 pandemic and New Zealand's related executive decision to close its borders to all foreign travelers precluded contract performance.

The contracts are governed by, and must be interpreted in accordance with, New Hampshire law.  Additionally, the parties seem to agree that at least with respect to Count Two (relating to the 2020 tour season), there are no genuinely disputed material facts, and that claim can be resolved as a matter of law.  Each party has moved for summary judgment – PJS solely on Count Two of the complaint; Tauck on both counts.  For the reasons discussed, those motions are denied, albeit without prejudice.

**Background**

I.    The Contracts.

In 2017, Tauck was looking for an aircraft charter agent to arrange air transportation for the New Zealand portions of its Australia/New Zealand tours.  Tauck and PJS eventually reached an agreement and, in January of 2018, the parties executed an "Air Charter Services Blanket Purchase Agreement" (the "BPA") (document no. 21-3).  That contract established the general terms under which Tauck would book, and pay, for air transportation, as well as any charges associated with each such booking.  The contract also included an agreed-upon cancellation policy.  The BPA makes plain that "PJS does not own or operate aircraft."  Id. at para. 12.  Instead, PJS "acts as agent for its clients in negotiating and facilitating transportation with licensed air carriers."  Id.  (The court makes note of this because the parties engage in a fairly lengthy debate over whether PJS purchased or merely invested in a dedicated aircraft for Tauck's exclusive use in New Zealand.)

Attached to the BPA is Exhibit C, which sets out the "standard terms and conditions" of the parties' contractual relationship.  One of those provisions – the "Force Majeure" clause - provides that, "PJS is not responsible" for delays, losses or damages of any kind caused, in whole or in part by

Force Majeure, acts of war, terrorism, adverse meteorological
conditions, mechanicals, air traffic control delays or other
unforeseeable circumstances.  Id. at 9.  Because the parties
recognized that weather, staffing, or mechanical issues might
lead to occasions on which PJS would be unable to arrange for
the dedicated aircraft at the appropriate tour location or at
the time Tauck needed it, the BPA also includes a section
entitled "Contingency Management & Interruption."  In that
section PJS declares that it is its "policy" to "have a minimum
of two contingency plans in place for every flight."  But "PJS
may arrange for alternative transportation only with the express
written authorization from [Tauck]."  See BPA, Section 20.

     The BPA also contemplated that before Tauck actually booked
any aircraft through PJS, the parties would execute one or more
"Statements of Work" which would address the details of the
parties' relationship, payment terms, and scheduling with
respect to particular flight operations.  PJS and Tauck executed
the Statement of Work (document no. 21-4) in May of 2018.  Its
term ran from January 13, 2019, through January 14, 2023, and
applied to "2019-2022 Tauck Australia-New Zealand Grand Tour (NZ
portion only) and 2019-2022 Tauck New Zealand Spotlight Tour."
Id. at 1.  The Statement of Work describes three different
routes for which PJS would provide air transportation, all of

which were within New Zealand: Wellington to Blenheim; Blenheim

to Manapouri; and Queenstown to Auckland.  It also obligated PJS

to provide Tauck with a dedicated Embraer 145 LR Regional Jet

with 44 passenger seats for use in Tauck's New Zealand tours.

<u>Id</u>.


     For purposes of this litigation, three provisions of the

Statement of Work are relevant:


> **Contract Minimums (Guarantee):** Tauck must guarantee a
> minimum of 50 tours per year.  In the event of a
> shortfall in the number of tours operated in any
> Season, Tauck will pay to Supplier the 5O tour minimum
> price for the applicable Season as set forth on Table
> 1 of this Agreement.  By way of example, if Tauck
> operates 48 tours in the 2020 Season, Tauck will owe
> Supplier an additional payment of $125,866 (50 tour
> minimum less 48 tours operated = 2 tour penalty x USD
> $62,933 per tour = USD $125,866).

> **Force Majeure:**  PJS is not responsible for delays,
> losses or damages of any kind caused in whole or in
> part by Force Majeure, acts of war, terrorism, adverse
> meteorological conditions, air traffic control delays
> <u>or other unforeseen circumstances</u>.

>                     *  *  *

> <u>The definition of Force Majeure in the Blank Purchase
> Agreement 2017-3746 that governs this Statement of
> Work shall be modified to include</u> Acts of God, <u>events
> of nature</u>, <u>epidemics</u>, [acts of] <u>civil or military
> authority</u>, strikes (other than with respect to
> Supplier) or labor disputes (other than with respect
> to Supplier), travel advisories of the Department of
> State of the United States of America, war, warlike
> activity, acts of terrorism and/or domestic or
> international violence of any nature either directly
> affecting the area where this Contract is to be

performed or causing disruption of travel to or from
the area, or due to adverse market reaction to any of
the foregoing events of Force Majeure.

**Adverse Economic Conditions:**   In the event that:

   a. During the Term, if the Dow Jones Industrial Index
      as published daily by the Wall Street Journal
      sustains a 30% decrease within a period not to
      exceed 75 calendar days (a "Market Correction");
      and

   b. That either Party exercises its rights in this
      Section 6 by providing the other party with
      written notice within 14 days of such Market
      Correction;

   c. Then the <u>Agreement will automatically terminate at</u>
      the later of (i) <u>the end of the current Season</u>
      and (ii) 180 calendar days from the date that
      written notice is received by the receiving
      party.

      Nothing contained In this Agreement shall be
      construed as to relieve Tauck from its obligation
      to pay Supplier for all flights flown <u>or which</u>
      <u>Tauck is otherwise committed to by this</u>
      <u>Agreement</u>.

<u>Id</u>. at 3, 5 (emphasis supplied).  As an aside, the court notes

that the parties agree that the "Force Majeure" provisions of

the BPA, as amended by the Statement of Work, extend protection

from Force Majeure events only to PJS; they do not apply to

Tauck.


     Additionally, the BPA contains an acceleration clause which

provides that: "Upon written notice of cancellation, all flights

not yet flown will be cancelled, and PJS will immediately be due

any outstanding charges pursuant to this Agreement, including
all applicable cancellation fees as set forth within this
Agreement, and all other outstanding charges to flights already
flown, but not yet paid by Customer." Id. at 1.


II.  The 2019 Tour Season.

In the spring of 2018, Tauck provided PJS with its
anticipated 2019 schedule of New Zealand tours.  The schedule
was ambitious.  Tauck would operate 72 tours (22 more than the
minimum required), beginning on January 13, 2019.  A few months
later, however, PJS informed Tauck that it was having difficulty
securing an Air Operator Certificate for the Embraer aircraft.
The parties agreed to replace that aircraft with an ATR-72
Turboprop.  On December 11, 2018, PJS notified Tauck that the
required final audit (clearance) of the ATR-72 was scheduled for
January 11, just a few days before the start of Tauck's 2019
tour season.  Then, on January 3, 2019, PJS informed Tauck that
the ATR-72 aircraft had been damaged and was not expected to be
in service until at least the third week in January.  As it
turned out, the aircraft audit was not completed until February
6, 2019, and inspectors did not approve the aircraft for flight
until February 7, 2019, approximately three weeks after the date
on which PJS was obligated to arrange the first scheduled flight
for Tauck.

Because of the mechanical issues with the ATR-72, it was unavailable for eight of the tours operated in January. Accordingly, Tauck availed itself of its rights under the BPA and elected to contract with a different air carrier (Alliance Air) to provide air transportation for those tours. It appears that Air Alliance had provided air transportation services to Tauck previously and Tauck simply continued (or re-established) its relationship with Alliance into January of 2019. For its part, PJS agreed to refund the monies Tauck already paid for those eight tours. PJS insists, however, that those flights do not count toward Tauck's contractual obligation to operate a minimum of 50 tours with PJS.

Tauck notes that, "Despite PJS inability to perform, Tauck still conducted a total of 55-57 tours during the 2019 tour season: 48 tours with PJS, and 7-9 with Alliance Air." Defendant's Memorandum in Support of Summary Judgment (document no. 22-1) at 6-7. Thus, says Tauck, it would have met the 50 tour minimum with PJS but for PJS's own failure to perform under the contract by neglecting to provide the ATR-72 Turboprop for use during those eight tours in January. According to Tauck, PJS "breached" the parties' agreement with respect to those eight tours by failing to provide the specified ATR-72 Turboprop

in a timely manner, and Tauck cannot possibly be held liable for
any of PJS's alleged damages arising from that failure.

PJS has a different perspective, saying that the contracts
"required" it to have a "minimum of two contingency plans in
place for every flight to quickly recover from a mechanical"
delay, which it had in place.  See BPA at Section 20.  Moreover,
says PJS, consistent with that obligation, it offered to "sub-
service" the January flights, either through Air Chathams or Air
New Zealand.  See Deposition of Greg Raiff, Chief Executive
Officer of Private Jets Services (document no. 23-2) at 63, 66-
67.  Thus, it argues, it was never in breach of the parties'
contracts.  And, although Tauck decided to exercise its
contractual option to decline the alternate flight arrangements
offered by PJS and, instead, use a different air carrier while
the ATR-72 Turboprop was unavailable, PJS asserts that Tauck
remained obligated to meet the annual 50 tour minimum.  Because
Tauck operated only 48 tours with PJS that season, PJS asserts
it is still entitled to payment for the two "un-booked" tours.

III. The 2020 Tour Season.

In 2020, Tauck's ability to conduct its tours in New
Zealand was undermined by the global COVID-19 pandemic.  From
January 1 through March 19, 2020, Tauck operated, and PJS

arranged air travel for, 23 tours in New Zealand.  On March 20,

2020, however, New Zealand closed its borders to foreign

travelers through (and beyond) the remainder of that year.  At

that point, Tauck was not able to operate any of its remaining

2020 tours in New Zealand and all were cancelled.  Tauck

refunded pre-payments that its customers had made.  In total,

Tauck says it "refunded $4,925,000 to customers for trips to New

Zealand."  Affidavit of Philip Crosby, Tauck's Chief Financial

Officer/Treasurer (document no. 24-7) at para. 24.


        Given those circumstances, PJS and Tauck attempted but were

unable to resolve their differences with respect to their

relative obligations under the contracts, nor were they able to

amend the contracts to each party's satisfaction.  On May 28,

2020, Tauck invoked the "Adverse Economic Conditions" provision

contained in the Statement of Work and cancelled the parties'

contracts in their entirety:

>     Please be advised that a Market Correction has
>     occurred and that Tauck hereby exercises its rights
>     under Section 6 of the SOW to terminate the Agreement
>     (including the Blanket Purchase Agreement and the
>     SOW).  This letter constitutes written notice of
>     termination given pursuant to Section 6.b of the SOW.

Letter from Tauck to PJS dated May 28, 2020 (document no. 21-

32).  Under the terms of the Statement of Work and, in

particular, the Adverse Economic Conditions provision, the contracts between the parties would terminate at "the end of the [2020] season" and, absent legal excuse, Tauck remained obligated to pay PJS "for all flights flown" as well as all other obligations for which "Tauck is otherwise committed to by this Agreement."  Statement of Work, Section 6, at 3.  That, says PJS, means Tauck still must honor (and pay for) its guarantee of a minimum of 50 tours for the 2020 season – notwithstanding Tauck's inability to actually operate those tours.  Because Tauck operated only 23 tours in 2020, PJS says it is entitled to payment for the remaining 27 tours it was promised.

The contract terms appear to be weighted in favor of PJS. According to PJS, that was both intentional and understood by the parties, because PJS was making a significant up-front expenditure to secure the necessary dedicated aircraft, and it needed to be assured that it would have a guaranteed stream of income from Tauck to cover those sunk costs.  As discussed more fully below, PJS sees the annual 50 tour minimum as, in essence, a guaranteed annual minimum payment without which, PJS says, it would not have entered into the contracts with Tauck.

Tauck concedes that it may not seek to escape its contractual liability by invoking the contracts' Force Majeure provisions.  See, e.g., Defendant's Memorandum in Opposition (document no. 24-1) at 16 ("PJS and Tauck included Force Majeure language that protected both PJS and its air carrier . . . There is no disagreement that there is no similar language in either the BPA or the SOW protecting Tauck.").  Nevertheless, it contends that neither it nor PJS ever contemplated the scope and duration of the pandemic's economic impact.  Nor, more specifically, did either party imagine that New Zealand might close its borders to all non-citizens – a first in the country's history.  Consequently, says Tauck, it may properly invoke the common law contract doctrines of impossibility and frustration of purpose to excuse performance of its obligations under the 2020 contract, including meeting the 50-tour minimum commitment.

## Discussion

I.   The 2019 Tour Season.

As noted above, Tauck (but not PJS), moves for summary judgment on Count One of the complaint.  In support that motion, Tauck asserts that PJS's inability to provide the ATR-72 Turboprop for the first eight trips of the 2019 tour season amounts to a material breach of the parties' contracts.

> PJS breached the terms of the SOW by failing to have
> the aircraft ready by January 13, 2019 as required by
> the SOW.  PJS's breach forced Tauck to seek out
> another air carrier (Air Alliance) for the January
> 2019 tours. . . . PJS's claim under Count I is
> essentially an attempt to foist upon Tauck a penalty
> for PJS's own breach of the SOW.  Here, PJS should not
> be permitted to allege that Tauck breached the
> contract when PJS itself was the cause of Tauck
> operating only 48 tours with PJS in the 2019 season.

Defendant's Motion for Summary Judgment (document no. 22) at 2.

Because PJS breached the Statement of Work, Tauck argues, it

cannot now seek damages for Tauck's alleged breach.


PJS counters that its conduct did not amount to a breach of

contract and, even if it did, Tauck waived that breach by

failing to invoke the remedy provisions of those contracts in a

timely manner.

> PJS does not dispute that it was unable to obtain
> authorization to fly the dedicated aircraft until
> after the first nine tours of 2019.  However, the
> delay in receiving authorization does not constitute a
> material breach for two reasons.  First, PJS offered
> to subservice the flights pursuant to Section 20 of
> the BPA.  Second, Tauck waived the terms of Section
> Two and Three of the SOW — which appear to be the
> terms it is alleging PJS breached — by not invoking
> the remedies provided in those provisions.

Plaintiff's Opposition Memorandum (document no. 23) at 15).

Turning to PJS's first argument – that it did not breach the parties' agreements – the relevant section of the BPA provides as follows:

> **Contingency Management & Interruption**.  PJS' policy is always to have a minimum of two contingency plans in place for every flight to quickly recover from a mechanical, weather, or other Force Majeure. . . . When unforeseen interruptions occur, PJS's dedicated client service team will work with Customer to analyze all contingency options available, and if necessary, to reposition the closest suitable aircraft.  PJS may arrange for alternative transportation only with the express written authorization from Customer.  If the aircraft is unable to complete any portion of the Itinerary due to adverse weather, operational, or mechanical reasons, Customer shall be notified immediately and PJS shall credit to Customer all proposed charges with respect to the canceled charter flight legs.  Flights operated on a delayed or subcontracted basis will not be credited.

BPA, Section 20 (emphasis supplied).  In short, then, if the ATR-72 Turboprop was not available due to weather, operational, or (as in this case) mechanical reasons, PJS represented that its "policy" was to "work with [Tauck] to analyze all contingency options available (including two plans it would have in place)," but would only arrange alternate transportation "with the express written authorization" of Tauck.  "If the aircraft is unable to complete any portion of the itinerary, PJS shall credit [Tauck] all proposed charges with respect to the cancelled charter flight legs."

14

For its part, Tauck could either accept alternate
transportation proposed by PJS (and pay PJS as usual), or it
could secure its own transportation (and receive a credit from
PJS for the charges associated with the cancelled PJS flight).
PJS says it complied with the "requirements" of Section 20 by
offering Tauck an option to use a similar aircraft from either
Air Chathams or Air New Zealand.  As was its apparent
contractual right, however, Tauck declined those offers and
chose, instead, to arrange flights through a different air
carrier: Air Alliance.

The parties plainly anticipated that there might be
occasions on which the ATR-72 Turboprop would not be available
and PJS would endeavor to offer options or "alternative
transportation" for Tauck's consideration.  PJS appears to have
followed its policy under Section 20 of the BPA by having two
contingency plans and offering to arrange alternative
transportation.  But it does not follow either that Tauck failed
to "operate a tour" with respect to those occasions on which PJS
could not deliver the ATR-72, or that PJS is entitled to be paid

with respect to those operated tours for which it could not provide the ATR-72.[1]

Tauck's argument in support of summary judgment on count one is vague and undeveloped, providing little more than the claim that PJS materially breached because the aircraft was not ready on January 13, 2009, as required by the first paragraph of the Statement of Work ("Term: January 13, 2019 – January 14, 2023").  An argument could be made – though Tauck does not make it – that PJS breached the "Dispatch Reliability" provision of the Statement of Work.  See Id. at Section 2.  But, anticipating such an argument, PJS asserts that Tauck never timely invoked the remedy provisions of that section and, therefore, waived any claim that PJS breached.  In response, Tauck has remained silent.

The court is unwilling to resolve Tauck's motion on grounds not addressed by Tauck.  See, e.g., Pollack v. Goodwin & Assocs.

---

[1]    As noted above, the Statement of Work provides that, "Tauck must guarantee a minimum of 50 tours per year.  In the event of a shortfall in the number of tours operated in any Season, Tauck will pay to Supplier the 50 tour minimum price."  One unresolved question is whether that obligates Tauck to simply operate 50 "Tauck tours" (regardless of the air carrier involved, if the ATR-72 is unavailable) or whether it obligates Tauck to operate a total of 50 tours with the ATR-72 or PJS's "alternate" services.

Hosp. Servs., LLC, No. 20-CV-825-SM, 2021 WL 3773408, at *5

(D.N.H. Aug. 25, 2021) ("It is not enough merely to mention a

possible argument in the most skeletal way, leaving the court to

do counsel's work, create the [framework] for the argument, and

put flesh on its bones.  A litigant has an obligation to spell

out its arguments squarely and distinctly, or else forever hold

its peace.  While it is conceivable that viable arguments might

support the [defendant's] position — the court offers no opinion

on that point — at this juncture, [defendants] have failed to

develop arguments concerning most of [plaintiff's claims].")

(citations and internal punctuation omitted).  See generally

Int'l Tape Co. v. Technicote, Inc., 2000 WL 33667076 at *3

(D.N.H. April 21, 2000) (discussing why courts should be

reluctant to embrace legal arguments that have not been

presented by the parties).  See also Coons v. Indus. Knife Co.,

620 F.3d 38, 44 (1st Cir. 2010).


    At this juncture, Tauck has not carried its burden to

establish either that no material facts are genuinely disputed,

or that it is entitled to judgment as a matter of law.  At first

blush it might seem evident that PJS is not entitled to payment

for cancelled flights due to its own inability to provide the

reserved aircraft for that flight.  But the decisive question

might be phrased somewhat differently: e.g., did Tauck obligate

itself to pay PJS for 50 tours, even if PJS could not provide
the reserved aircraft with respect to some number, or even all,
of those 50 tours, if Tauck decided to reject alternatives
offered by PJS and instead arrange its own air transport?  And,
it might be argued that under these contracts Tauck contracted
to operate a minimum of 50 tours during the season using PJS,
but "operate" refers to extending to PJS the opportunity to
provide transportation for a particular tour according to the
contract terms.  That is, once PJS is presented with the
opportunity, that tour "counts" toward the minimum, even if PJS
cannot perform and Tauck elects to use alternative carriers.

The parties do not adequately engage on these potentially
dispositive issues (which may involve genuinely disputed
material facts) and the record is not sufficiently developed to
permit summary judgment.  See e.g. Foundation for Seacoast
Health v. HCA Health Servs. of New Hampshire, Inc., 157 N.H.
487, 501 (2008), citing N.A.P.P. Realty Trust v. CC Enterprises,
147 N.H. 137, 139 (2001) ("The language of a contract is
ambiguous if the parties to the contract could reasonably
disagree as to the meaning of that language.").  The court must,
then, necessarily deny Tauck's motion for summary judgment on
Count One of the complaint.

II.   <u>The 2020 Tour Season</u>.

     Despite the closure of New Zealand's border, one might
speculate that it was not "impossible" for Tauck to have
conducted tours within New Zealand in 2020 – albeit tours that
would have been available only to citizens of New Zealand and/or
non-citizens who were already in the country when the borders
were closed.  In other words, while Tauck plainly could not
operate its tours as contemplated after the border closure, it
is not entirely clear that Tauck's ability to conduct <u>any</u> tours
was rendered impossible or unlawful by the pandemic-related
border closure.  <u>See e.g.</u> <u>Bower v. Davis & Symonds Lumber Co.</u>,
119 N.H. 605, 609 (1979) ("The impossibility doctrine requires
that there be complete and permanent impossibility.")  <u>See</u>
generally 14 Corbin on Contracts § 74.1 (2021).


     In any event, on this record, Tauck's stronger argument is
that it is excused from performance under the common law
doctrine of "frustration of purpose" or "commercial
frustration."  The New Hampshire Supreme Court has described the
doctrine as follows:

     The doctrine of commercial frustration assumes the
     possibility of literal performance but excuses
     performance because <u>supervening events</u> have
     <u>essentially destroyed the purpose for which the</u>
     <u>contract was made</u>.  Under the doctrine, a contract is
     to be considered subject to the <u>implied condition</u> that

the parties shall be excused in case, before
breach, the state of things constituting the
fundamental basis of the contract ceases to exist
without default of either of the parties.

Gen. Linen Servs., Inc. v. Smirnioudis, 153 N.H. 441, 443 (2006)

(citations and internal punctuation omitted) (emphasis

supplied).  See also Perry v. Champlain Oil Co., 101 N.H. 97,

98-99 (1957) ("Where the assumed possibility of a desired object

or effect to be attained by either party to a contract forms the

basis on which both parties enter into it, and this object or

effect is or shortly will be frustrated, a promisor who is

without fault in causing the frustration, and who is harmed

thereby, is discharged from the duty of performing his promise

unless a contrary intention appears.") (quoting Restatement of

Contracts, § 288).


Generally speaking, then, the common law doctrine of

commercial frustration provides that a party is entitled to

relief from its contractual obligations when:

(1)   the principal purpose in contracting has been
      substantially frustrated,

(2)   the frustration was caused by a supervening event
      that was not in fact contemplated by the parties,
      and

(3)   the risk of the event occurring was not allocated
      by contract or otherwise.

14 Corbin on Contracts § 77.3 (emphasis supplied).


    A.   The Contracts' Principal Purpose.

    In arguing that Tauck cannot invoke the doctrine of

commercial frustration to avoid its contractual obligations, PJS

focuses not on the overarching purpose of the contracts as a

whole, but rather on the narrower purpose of the "contract

minimum" provision set forth in section 10 of the Statement of

Work.  Accordingly, PJS argues that:

> [T]he purpose of the Contract Minimum provision of the
> Agreement has not been frustrated by COVID-19.  The
> purpose of that provision was to provide a safety net
> for PJS in its purchase of the dedicated aircraft.
> COVID-19 has not altered the purpose of that
> provision.  If anything, COVID-19, coupled with
> Tauck's refusal to pay, has provided a greater need
> for that safety net.

Plaintiff's Opposition Memorandum (document no. 23) at 23

(emphasis supplied).  But, the proper focus is not on the

intended purpose of individual provisions of the contracts.

Rather, it is on the "purpose" of the contracts viewed as a

whole.


    Viewed in their entirety, the contracts' overarching

purpose is plain: PJS was to arrange air transportation services

for two of Tauck's identified seasonal tours of New Zealand.

So, for example, the Statement of Work required PJS to provide a dedicated, 44-seat Embraer 145 LR Regional Jet (later amended to an ATR-72 Turboprop) for use in Tauck's "Australia-New Zealand Tour" and its "New Zealand Spotlight Tour." Statement of Work at 1 (emphasis supplied). It also obligated PJS to provide a "level of service and quality consistent with the expectations of Tauck and Tauck's guests" and imposed on PJS the obligation to take immediate corrective action to resolve any identified shortcomings. Statement of Work at Section 3 (emphasis supplied). The Statement of Work also acknowledges that "this Aircraft, Crew, and all personnel will be dedicated to, and specifically configured and wrapped for Tauck." Id. at Section 7. See also Id. at Section 10 (obligating PJS to provide an aircraft with a Tauck "full wrap aircraft decal," aircraft interior designed to Tauck's specifications; "two dedicated tour concierge and one Program Manager positioned in New Zealand"; and in-flight catered meals for Tauck's customers); Plaintiff's Opposition Memorandum (document no. 23) at 23 (acknowledging that the overarching "purpose of the Agreement was for PJS to provide Tauck a dedicated aircraft for its New Zealand tours." Id. at 23.

    Given the record, the objective manifestation of the parties' intent, as expressed in both the BPA and Statement of

22

Work, is unmistakable: PJS was to provide Tauck with a
dedicated, "wrapped" aircraft (and attendant services) for
Tauck's exclusive use in <u>conducting two specified seasonal tours</u>
<u>within New Zealand</u>.  The principal purpose was not, as PJS
suggests, to merely provide Tauck with an aircraft that it could
use as it pleased – say to deliver air cargo.  <u>See, e.g.</u>,
Plaintiff's Opposition Memorandum (document no. 23) at 23.
("Tauck could have chosen to use the aircraft PJS provided for
whatever purpose it deemed fit.").  And, the contracts'
principal purpose was plainly frustrated when New Zealand closed
its borders and Tauck was no longer permitted to bring its
touring customers into the country.  Thus, Tauck has established
the first of three essential elements of the common law doctrine
of commercial frustration.  It falters, however, in establishing
the remaining two.

    B.    Contemplation of the "Supervening Event."

Pointing to the Force Majeure clause of the BPA (as amended
by the Statement of Work), PJS strenuously argues that the
parties anticipated the "possibility of epidemics or
governmental advisories that could prevent travel."  Plaintiff's
Memorandum in Support of Summary Judgment (document no. 21-1) at
7.  That is correct in the sense that PJS protected itself from
such risks, and Tauck did not.  Given the contract language, PJS

at least anticipated that an epidemic (or "epidemics") might
occur in the future, and/or that civil authorities might take
action in a manner that could materially affect its ability to
perform its contractual obligations.  That is, that epidemics
and the exercise of civil authority might make it economically
inadvisable or impractical or even impossible to conduct the
contemplated tours of New Zealand.  It is also apparent that, in
consultation with each other, the parties negotiated the Force
Majeure terms explicitly.  PJS protected itself from risks
associated with epidemics and the exercise of civil authority,
while Tauck did not.  Tauck might have protected itself as well
but, for reasons satisfactory to it, it did not.  Importantly,
however, it is not unarguably clear as a matter of New Hampshire
law that the COVID-19 pandemic, or closure of the New Zealand
border were "in fact" contemplated by the parties.

       C.   Was the Risk Allocated by the Contracts?

       Here, the terms of the amended Force Majeure clause may
have implicitly (but certainly not explicitly) assigned the risk
of adverse events materially affecting contract performance
related to epidemics, and the exercise of civil authority, to
Tauck.  As noted, the language of the clause was actively
negotiated (Tauck even suggesting that PJS include protection
from "epidemic" events).  Tauck could have protected itself, in

addition to excusing PJS's performance, if Force Majeure events
occurred.  What is not clear under New Hampshire law, however,
is whether by agreeing to the Force Majeure clause as written,
Tauck waived its otherwise available contract defenses.  That is
to say, it is unclear under New Hampshire common law whether a
Force Majeure clause protecting just one of the parties
necessarily allocates (by implication) the risks of such events
to the other party to the extent of depriving that party of
otherwise-available common law defenses, like impossibility of
performance or frustration of purpose.

The record discloses no obvious reason why Tauck would
assume the risk of the Force Majeure events listed.  But, as
Judge Posner noted, "a promisor might want his promise to be
unconditional, not because he thought he had superhuman powers
but because he could insure against the risk of nonperformance
better than the promisee, or obtain a substitute performance
more easily than the promisee." N. Indiana Pub. Serv. Co. v.
Carbon County Coal Co., 799 F.2d 265, 276 (7th Cir. 1986)
(citing Field Container Corp. v. ICC, 712 F.2d 250, 257 (7th
Cir. 1983) and Holmes, The Common Law 300 (1881)).  And, as PJS
argues, Tauck was aware of PJS's substantial investment risk and
perhaps was motivated to obtain PJS's services by extending
broad protection to PJS while assuming broad risk itself.

Tauck suggests in passing that an "epidemic" does not a "pandemic" make, so a Force Majeure event in the nature of a pandemic was not a risk assumed by it, implicitly or otherwise. But the Force Majeure clause includes a "catchall" phrase covering "other unforeseen circumstances."  When a catchall provision is included in a Force Majeure clause it is limited to "things of the same kind or nature as the particular matter mentioned."  Tommy Hilfiger Retail, Inc. v. North Conway Outlets, LLC, 2000 WL 1480450 (D.N.H. February 14, 2000) (citing URI Cogeneration Partners L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1287 (D.R.I. 1996)).  A pandemic, in colloquial expressions, is an epidemic that travels across multiple countries or continents — spreading over and infecting large geographic areas.  There can be little doubt that the COVID-19 pandemic, as it threatened New Zealand, was a "thing of the same kind or nature" as an epidemic, and within the Force Majeure clause event described as "epidemics."  And, of course, the exercise of civil authority by the government of New Zealand in closing the nation's borders falls comfortably within the event described in the clause following "epidemics": "[acts of] civil or military authority."  See e.g. Rudolph v. United Airlines Holdings, 519 F. Supp. 3d 438 (N.D. Ill. 2021) (government ordered border closure due to COVID-19 pandemic falls comfortably within the definition of a Force Majeure event

and the event was the proximate cause of air carrier's inability
to perform contract for transportation).

It seems likely, then, that a bare, conventional analysis
would result in finding Tauck liable to perform, and unable to
invoke the common law excuses of impossibility or frustration.
But the amended Force Majeure clause poses a quirksome
impediment.

As noted above, the Force Majeure clause, as specifically
worded, protects only PJS from liability should an event occur.
It does not explicitly deprive Tauck of recognized common law
defenses like impossibility of performance or frustration of
purpose.  The clause may, under New Hampshire law, <u>implicitly</u>
operate to deprive Tauck of those defenses, but no clear
statement on that point can be found in New Hampshire precedent.
A critical question then arises under New Hampshire's common
law:

> whether a force majeure clause should be deemed a
> relinquishment of a party's right to argue
> impracticability or frustration, on the theory that
> such a clause represents the integrated expression of
> the parties' desires with respect to excuses based on
> supervening events; or whether such a clause either in
> general or as specifically worded in this case covers
> any different ground from [the defenses of
> impossibility or frustration of purpose].

N. Indiana Pub. Serv. Co., 799 F.2d at 277.  That is,
impossibility and frustration of purpose defenses may
remain available contract defenses unless the contract
documents explicitly provide otherwise.

Given the uncertainties in New Hampshire's common law,
the court cannot rule as a matter of law in favor of either
PJS or Tauck with respect to Count 2.

## Conclusion

For the foregoing reasons, PJS's motion for partial summary
judgment as to Count Two (**document no. 21**) is denied, albeit
without prejudice.  Tauck's motion for summary judgment on both
Count One and Count Two (**document no. 22**) is likewise denied,
without prejudice.

The court will schedule a case management hearing in the
coming weeks at which counsel will be afforded the opportunity
to be heard on whether the court should certify the following,
or other, question(s) to the New Hampshire Supreme Court:

> Whether, under New Hampshire's common law, the Force
> Majeure clause as written (protecting only PJS) should
> be deemed a relinquishment of Tauck's right to
> interpose the common law defenses of impossibility,
> impracticability, or frustration of commercial

purpose, on the theory that the clause represents the
parties' implicit allocation of the identified risks
to Tauck.


Written memoranda of law are welcome but not required.


     **SO ORDERED.**


                            _____

                            Steven J. McAuliffe
                            United States District Judge


September 30, 2022

cc:  Counsel of Record