```
                     UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE
```

Private Jet Services Group, LLC,
    Plaintiff

    v.                                Case No. 20-cv-1015-SM
                                      Opinion No. 2024 DNH 049

Tauck, Inc.,
    Defendant

### **O R D E R**

Private Jet Services Group ("PJS") is a New Hampshire-based private aircraft booking agent.  It brought this breach-of-contract action against Tauck, Inc., a Connecticut-based provider of high-end domestic and international guided tours.  In general, the parties' contracts contemplated that PJS would provide, and Tauck would use, a dedicated aircraft to conduct a minimum of fifty (50) tours of New Zealand for each of the 2019-2022 tour seasons.  On May 28, 2020, Tauck cancelled the parties contracts and this litigation followed.  In its complaint, PJS alleges that Tauck breached those contracts in each of two seasons: 2019 (count one) and 2020 (count two).

Pending before the court is PJS's motion to amend its complaint to add a new claim for unjust enrichment (arising out

of Tauck's conduct that began sometime after July 31, 2022 - more than two years after the parties' contracts had been cancelled). For the reasons discussed, that motion is denied.

**Background**

I. Factual Background.

The facts giving rise to PJS's claims against Tauck, as well as the details of the parties' contractual agreements, are set forth at length in the court's order dated September 30, 2022 (document no. 56). Those details need not be recounted. It is sufficient to note the following.

In 2017, Tauck was looking for an aircraft charter agent to arrange air transportation for the New Zealand portions of its Australia/New Zealand tours. Tauck and PJS eventually reached an agreement and, in January of 2018, the parties executed an "Air Charter Services Blanket Purchase Agreement" (the "BPA") (document no. 21-3). That contract established the general terms under which Tauck would book air transportation through PJS for its clients. The BPA also contemplated that before Tauck actually reserved any aircraft through PJS, the parties would execute one or more "Statements of Work" which would address the details of the parties' relationship, payment terms, and scheduling with respect to particular flight operations.

PJS and Tauck executed the Statement of Work (document no. 21-4) in May of 2018 (the "SOW").  Among other things, the SOW required Tauck to guarantee a minimum of fifty tours per year and obligated it to pay PJS an agreed-upon sum for each "missed" tour below that threshold.  The contract's term ran from January 13, 2019, through January 14, 2023, and applied to "2019-2022 Tauck Australia-New Zealand Grand Tour (NZ portion only) and 2019-2022 Tauck New Zealand Spotlight Tour."  Id. at 1.

On May 28, 2020, in the midst of the worldwide COVID-19 pandemic, Tauck invoked the "Adverse Economic Conditions" provision contained in the Statement of Work and cancelled the parties' contracts in their entirety.  This litigation ensued.

In count one of its complaint, PJS alleges that Tauck employed its services for only 48 tours during the 2019 tour season – two fewer than the parties' agreed-upon minimum.  In count two of its complaint, PJS says Tauck breached the parties' agreements during the 2020 tour season by using PJS's services for only 23 tours – 27 fewer that the 50-tour seasonal minimum.  PJS claims that it is owed roughly $265,000 in damages for the 2019 tour season and nearly $1.7 million in damages for the 2020 season.  Tauck denies that it breached either of the parties' contracts and says it is excused from performing under those

3

contracts, either because PJS breached first or because its performance was rendered impossible by external events (i.e., the COVID-19 pandemic and New Zealand's related decision to close its borders to foreign travelers).

In short, then, the conduct about which PJS complains is all confined to the 2019 and 2020 tour seasons and is based upon the language of the parties' contracts. As noted above, PJS now seeks leave to amend its complaint to add a claim for unjust enrichment, arising from Tauck's alleged conduct following New Zealand's decision to reopen its borders to foreign travelers, beginning in August of 2022.

II.  Procedural Background.

PJS filed suit against Tauck on October 7, 2020. The original scheduling order (document no. 10, approved on December 29, 2020) provided that PJS would be afforded until April 1, 2021 to amend its complaint. The dates for the close of discovery, submission of summary judgment motions, and trial were all subsequently extended. See First Amended Scheduling Order (document no. 14); Second Amended Scheduling Order (document no. 20). However, the date for amending the complaint has remained consistent: April 1, 2021 - that is to say, more

4

than three years ago. Discovery closed roughly two and one-half years ago, on November 10, 2021.

In September of 2022, the parties submitted cross-motions for summary judgment that highlighted an unresolved question of state common law. Those motions were denied, without prejudice, and shortly thereafter the court certified the potentially dispositive question of state law to the New Hampshire Supreme Court. See Certification Order (document no. 58). That question focused on whether the common law defenses of impossibility, impracticability, and frustration of commercial purpose were available to Tauck, given that the parties' contracts contained a "force majeure" clause that protected only PJS. The question presented was whether, by agreeing to that one-sided force majeure clause, Tauck implicitly waived those common law contract defenses.

Earlier this year, on April 23, 2024, the New Hampshire Supreme Court answered the certified question. Private Jet Services v. Tauck, Inc., 2024 WL 1725219 (N.H. Apr. 23, 2024). In its opinion, the court held that the common law defenses of impossibility, impracticability, and frustration of commercial purpose remain available to contracting parties unless expressly waived. It also concluded that a force majeure clause

5

protecting only one party to a contract does not, standing alone, operate as such a waiver and, therefore, its presence in a contract does not preclude the other party from raising those fundamental common law contract defenses.

Roughly three weeks later, PJS filed its motion seeking leave to amend its complaint to add a claim for unjust enrichment. That claim has nothing to do with the 2019 or 2020 travel seasons, nor is it in any way related to the certified question presented to the New Hampshire Supreme Court. Instead, it relates entirely to Tauck's allegedly improper conduct after July 31, 2022 (according to PJS, after New Zealand reopened its borders to foreign travelers, Tauck resumed its travel operations there - PJS does not specify when - and it secured air transportation services through a party other than PJS).

## Standard of Review

The precise standard of review governing a motion to amend a complaint varies depending upon its timing. A plaintiff is permitted to amend its complaint once as a matter of right - either within 21 days of filing it or within 21 days after the defendant has filed a responsive pleading. Fed. R. Civ. P. 15(a). After that, permission of the court or the consent of the opposing party is required. Nevertheless, Rule 15(a)(2)

6

provides that the court should "freely give leave when justice so requires."

As time passes, however, the burden on a plaintiff seeking to amend its complaint becomes more onerous - particularly (as is the case here) if the court has entered a scheduling order that includes a deadline for the amendment of pleadings.

> As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments (as was apparently the case here). Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b).

Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) (citations and footnotes omitted). It also bears noting that, "Regardless of the context, the longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." Id. See also Miceli v. JetBlue Airways Corp., 914 F.3d 73, 86 (1st Cir. 2019) ("Such an elevated standard makes perfect sense: without it, scheduling orders would be little more than aspirational statements, to be

7

disregarded by the parties whenever compliance proves inconvenient.") (citations and internal punctuation omitted).

## Discussion

I. PJS's Proposed New Claim.

PJS says the only way for it to secure (on behalf of Tauck) an aircraft registered in New Zealand was through a New Zealand individual or entity. Accordingly, it entered into an agreement with a company called Air Chathams, which agreed to serve as the New Zealand-based owner and operator of the plane. Air Chathams purchased the aircraft – which PJS calls "the PJS plane" – for $4.8 million. PJS says it provided twenty-five percent of the purchase price ($1.2 million) and Air Chathams financed the balance ($3.6 million). Once Tauck cancelled the parties' contracts, PJS says it lost the anticipated income stream with which it had planned to recover its investment in the plane and, therefore, suffered a significant loss.

> When Tauck canceled the PJS-Tauck Agreement, PJS negotiated a settlement and release from its continued payments to Air Chathams, pursuant to the terms of its agreement with Air Chathams.
>
> The release and settlement included PJS walking away from the repayment of its $1.2 million USD advance to Air Chathams in exchange for a release from all future payments to Air Chathams.
>
> That release was in line with PJS's agreement with Air Chathams which, in the event of termination, required

8

> PJS to either (1) forfeit the remaining funds it advanced to Air Chathams, or (2) purchase and take ownership of the PJS Plane outright.
>
> In August 2022, New Zealand reopened its borders to foreign travelers.
>
> Upon information and belief, <u>when Tauck restarted its tours in New Zealand</u>, <u>it contracted directly with Air Chathams for use of the PJS Plane at a rate lower than Tauck paid under the PJS-Tauck Agreement</u>.
>
> [Since some time after July 31, 2022,] Tauck has been operating its tours in New Zealand with use of the PJS Plane for almost two years without PJS as the broker, and, upon information and belief, will continue to do so for the foreseeable future, <u>retaining the full benefit of the PJS-Tauck Agreement without benefit to PJS</u>.

Affidavit of Greg Raiff, CEO, Private Jet Services (document no. 67-10), at paras. 17-22 (emphasis supplied). Those facts, says PJS, give rise to a viable common law claim against Tauck for unjust enrichment.

The legal merits of such a claim seem questionable, at best. But, at this juncture, that is not an issue. The question presented is whether PJS should be permitted to amend its complaint to add a new claim at this late stage. It should not.

9

II. <u>PJS has not Shown Good Cause</u>.

As noted above, the date for amending the complaint passed more than three years ago (April 1, 2021) and discovery closed approximately two and one-half years ago (November 10, 2021). Since then, both Tauck and PJS have filed dispositive motions, final pretrial statements, proposed jury instructions, and motions in limine. Consequently, PJS must show "substantial and convincing evidence" of "good cause" to amend its complaint at this juncture. <u>Steir</u>, 383 F.3d at 12. <u>See also</u> <u>Miceli</u>, 914 F.3d at 86 ("The 'good cause' standard focuses on both the conduct of the moving party and the prejudice, if any, to the nonmovant. In the decisional calculus, the moving party's diligence or lack of diligence serves as the dominant criterion. 'The longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend.'") (quoting <u>Steir</u>, 383 F.3d at 12). PJS has not shown good cause to amend its complaint at this late stage of the litigation.

Most importantly, PJS has not explained why it waited until now to seek to add a claim relating to conduct Tauck allegedly undertook nearly two years ago. While PJS points to the court's certification order to the New Hampshire Supreme Court as an

10

explanation for its delay, that is not an excuse.  There was no obstacle to filing its motion to amend at any time while the certified question was pending in state court.  This action was not stayed during that period, nor did the court impose any bar to the parties filing pleadings.  Given that, it would be difficult to conclude that PJS acted promptly and diligently in filing its motion to amend the complaint.  Instead, PJS seems to have waited until the New Hampshire Supreme Court issued its response to the certified question (perhaps hoping the court would eliminate Tauck's common law contract defenses).  It appears that only after the New Hampshire Supreme Court made clear that Tauck's common law defenses remain viable, did PJS decide to seek leave to add a new (and largely unrelated) claim to its complaint.

    Moreover, PJS itself acknowledges that if it were to amend its complaint, the court would be required to reopen discovery.  That would add significant additional delay to a case: (a) that has been pending for nearly four years; (b) in which discovery closed long ago; and (c) that is now ready for trial (or, at a minimum, another round of dispositive motions).  Amending the complaint at this late stage would also impose upon Tauck additional financial burdens and require it to revise its trial tactics to defend against a novel claim, covering a previously-

11

unaddressed time period. See generally Steir, 383 F.3d at 12 (1st Cir. 2004) ("Particularly disfavored are motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy.'") (quoting Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 52 (1st Cir. 1998)).

## Conclusion

For the foregoing reasons, as well as those set forth in defendant's memorandum in opposition (document no. 68), Private Jet Service's Motion for Leave to Amend Complaint (**document no. 67**) is denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 12, 2024

cc: Counsel of Record