UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Private Jet Services Group, LLC,
     Plaintiff

     v.                            Case No. 20-cv-1015-SM
                                         Opinion No. 2025 DNH 070

Tauck, Inc.,
     Defendant

## O R D E R

Private Jet Services Group ("PJS") is a New Hampshire-based private aircraft booking agent. It brings this breach-of-contract action against Tauck, Inc., a Connecticut-based provider of high-end domestic and international guided tours. The parties' relationship is governed by two contracts that work together: the Air Charter Services Blanket Purchase Agreement (the "BPA") (document no. 77-3) and the Statement of Work (the "SOW") (document no. 77-4). In general, those contracts contemplate that PJS would arrange for, and Tauck would use, a dedicated aircraft to conduct a minimum of fifty (50) tours of New Zealand per season, from 2019 through 2022.

PJS alleges that Tauck breached those contracts in each of two seasons. First, during the 2019 tour season, PJS says Tauck employed its services for only 48 tours – two fewer than the

parties' agreed-upon minimum (count one).  Next, PJS says Tauck
breached the parties' agreements during the 2020 tour season by
using PJS's services for only 23 tours – 27 fewer that the 50
tour seasonal minimum (count two).  PJS claims it is owed
roughly $265,000 in damages for the 2019 tour season and nearly
$1.7 million in damages for the 2020 season.

Tauck denies that it breached either of the parties'
contracts and says it is excused from performing under those
contracts, either because PJS breached first (count one) or
because its performance was rendered impossible by unanticipated
external events (count two).  More specifically, with respect to
the 2019 season, Tauck blames PJS for having failed to provide
the agreed-upon aircraft for the first eight tours of the
season, and says that failure amounts to a material breach.
With respect to the 2020 season, Tauck says the global COVID-19
pandemic and New Zealand's related decision to close its borders
to all foreign travelers precluded contract performance.

Each party has moved for summary judgment on both counts of
PJS's complaint.  For the reasons discussed, each motion is
granted in part and denied in part.

## Background

The factual background to this case, as well as the pertinent standard of review, are set forth in detail in the court's prior order and need not be repeated.  See Order Denying Cross Motions for Summary Judgment (Sept. 30, 2022) (document no. 56).  Those facts necessary to resolve the pending cross motions for summary judgment are discussed below.


## Discussion

I.  Count One - The 2019 Tour Season.

In the spring of 2018, Tauck provided PJS with its anticipated 2019 schedule of New Zealand tours.  The schedule was ambitious.  Tauck would operate 72 tours (22 more than the minimum required), beginning on January 13, 2019.  A few months later, however, PJS informed Tauck that it was having difficulty securing an Air Operator Certificate for the dedicated Embraer aircraft.  So, by letter agreement dated September 6, 2018, the parties amended the Blanket Purchase Agreement to replace the Embraer with an ATR-72 Turboprop.

On December 11, 2018, PJS notified Tauck that the required final audit (clearance) of the ATR-72 was scheduled for January 11, just a few days before the start of Tauck's 2019 tour season.  Then, on January 3, 2019, PJS informed Tauck that the

aircraft had been damaged and was not expected to be in service
until at least the third week in January.  As it turned out, the
aircraft audit was not completed until February 6, 2019, and
inspectors did not approve the aircraft for flight until
February 7, 2019, approximately three weeks after the date on
which PJS was obligated to arrange the first scheduled flight
for Tauck.

     Because of the mechanical issues with the ATR-72, it was
unavailable for eight of the tours Tauck operated in January.
See Deposition of John O'Neil, PJS Vice President of Operations,
Exhibit G to Defendant's Memorandum (document no. 78-8), at pg.
32, ln. 24-25.  Accordingly, PJS offered to "sub-service"
flights for those tours with aircraft secured through either Air
Chathams or Air New Zealand.  But, as was its right under the
Blanket Purchase Agreement, Tauck declined that offer and
elected to contract directly with a different air carrier
(Alliance Air) to provide suitable air transportation for those
eight tours.  And, because Tauck elected to employ a different
carrier for those tours, PJS agreed to refund the monies Tauck
had already paid for them.  PJS insists, however, that those
eight missed tours that were flown using Alliance Air do not
count toward Tauck's contractual obligation to "operate" a
minimum of 50 tours during 2019.

According to PJS, the parties specifically contemplated that there would be occasions on which the ATR-72 aircraft might be unavailable. Consequently, says PJS, the contracts "required" it to have a "minimum of two contingency plans in place for every flight to quickly recover from a mechanical" delay. See BPA at Section 20 (stating that it is PJS's "policy" to always have at least two contingency plans). And, says PJS, it had those contingency plans in place and offered to "sub-service" the January flights, either through Air Chathams or Air New Zealand. Thus, it argues, it was never in breach of the parties' contracts. While Tauck exercised its contractual option to decline the alternate flight arrangements offered by PJS, PJS asserts that Tauck nevertheless remained obligated to meet the annual 50-tour minimum set forth in Section 10 of the Statement of Work. Because Tauck operated only 48 tours with PJS that season, PJS claims it is still entitled to payment for the two "un-booked" tours.

As the court has previously noted, PJS interprets the 50-tour minimum guarantee in the Statement of Work as an annual minimum payment guarantee. In 2019, says PJS, that minimum payment was $3,055,000, or 50 times the base charter rate of $61,100.00 per flight. In support of that interpretation of the contract, PJS points to the language of Section 10 of the

Statement of Work, which provides that, "in the event of a
shortfall in the number of <u>tours operated</u> in any Season, Tauck
will pay to Supplier the <u>50 tour minimum price</u> for the
applicable Season as set forth on Table 1 of this Agreement."
SOW, at Section 10 (emphasis supplied).  In short, PJS says
Tauck failed to meet its contractual obligation to operate at
least 50 tours (with PJS) in 2019 and, as a result, PJS is
entitled to damages representing the difference between what
Tauck actually paid for the 2019 tour season and the "50 tour
minimum price" of $3,055,000.


Tauck has a different perspective, noting that, "Despite
PJS's inability to perform, Tauck still conducted a total of 55-
57 tours during the 2019 tour season (48 tours with PJS, and 7-9
with Alliance Air)."  Defendant's Memorandum in Support of
Summary Judgment (document no. 78-1) at 6.  Thus, says Tauck, it
<u>would have operated</u> 50 tours with PJS but for PJS's own failure
to perform under the contracts – that is, by neglecting to
provide the dedicated ATR-72 aircraft for use during those eight
initial tours in January.  In Tauck's view, PJS's conduct
amounts to a breach of the parties' contracts:

> PJS breached the contract by failing to provide the
> <u>air carrier that was specified</u> in the contract and
> then by failing to have the <u>replacement aircraft ready</u>
> by the beginning of the contract's terms.  PJS further
> breached Section 2 of the SOW, the "<u>Dispatch</u>

<u>Reliability</u>" clause by failing to deliver each
contracted-for flight on the Tauck dedicated aircraft.

Defendant's Memorandum (document no. 78-1) at 13.  Moreover,
says Tauck, because PJS breached the contracts, it is barred
from now seeking to enforce them.  The court disagrees.

With regard to Tauck's first argument – that PJS breached
by neglecting to provide the "air carrier that was specified in
the contract," it is unclear precisely what Tauck means.  It has
failed to point to any provision in the contracts that required
a specific air carrier (and the court has found none).  If Tauck
is referring to <u>aircraft</u> specified in the Statement of Work (a
dedicated "Embraer 145 LR Regional Jet"), the parties amended
that provision of the contract on September 6, 2018, and agreed
that the dedicated aircraft would be an ATR-72.  <u>See</u> Letter
Agreement (document no. 77-11).

With regard to Tauck's claim that PJS failed to have the
ATR-72 available at the start of the 2019 tour season, it is
unclear whether that could have been considered a breach of
contract.  But, the important point is this: the parties
certainly did not treat it as a breach.  Indeed, they plainly
anticipated that there would be occasions on which the aircraft
would not be available, whether for mechanical or other reasons.

See, e.g., BPA, Section 4, "Schedule" ("Air carrier will use its commercially reasonable efforts, and the efforts standard in the industry, to comply with the timetable set forth in any SOW and as Customer's schedule requires; provided, however, that departure times and flight routes are subject to, and may be altered by, conditions beyond the reasonable control of Air Carrier, including without limitation, . . . mechanicals."). See also Id. at Section 20, "Contingency Management" (explaining the parties rights and obligations should the aircraft be "unable to complete any portion of the itinerary due to adverse weather, operational, or mechanical reasons").  As was its contractual right under Section 20, Tauck elected to secure air transportation from another carrier when the ATR-72 was not available due to mechanical issues.  It did not, however, declare a breach or cancel the contracts.  Instead, it simply opted to secure air transportation through a third party for those few flights and then resumed business with PJS once the ATR-72 was ready.

Next, Tauck asserts that PJS breached Section 2 of the SOW, "Dispatch Reliability."  That section of the contract provides, in material part, that:

> PJS agrees to maintain a 95% Dispatch Reliability rate. Dispatch Reliability means each flight:

> i.  will be delivered on the Tauck dedicated
> aircraft; and
>
> ii.  will depart within 45 minutes of its
> scheduled departure time during each Tour Season.

SOW, at Section 2.  Should PJS fail to meet those requirements, the contract provides that Tauck has the right to terminate the parties' contracts.  Id. ("If the Dispatch Reliability rate for any Tour Season, as measured after the completion of the last tour of the Tour Season, falls below 95%, Tauck will have the right to terminate the agreement with 180 days' notice.").  According to Tauck:

> In prior court filings, PJS does not dispute [that it breached the "Dispatch Reliability" provisions] but argues instead that Tauck waived a breach of contract claim by failing to timely invoke the applicable remedy provisions.  This argument misses a fundamental point: Tauck is not seeking damages for a breach of contract.  However, the fact that PJS was in a material breach of the very terms of the contract it now seeks to enforce forecloses their efforts to hold Tauck accountable for a breach of a contract term it did not commit and for which PJS had already breached.

Defendant's Memorandum (document no. 78-1) at 14 (emphasis supplied).  Again, the court disagrees.

Even if one were to assume that PJS did breach the contracts when it failed to provide the ATR-72 at the start of the 2019 tour season (despite having offered two alternative aircraft and carriers), Tauck did not declare a breach or even

behave as if it believed PJS had breached - indeed, Tauck went on to accept 48 flights that PJS provided in 2019.  Nor did Tauck declare a breach and terminate the agreements at the end of the 2019 season, once the "Dispatch Reliability" figures could be calculated.  Rather, Tauck continued its contractual relationship with PJS into the 2020 tour season.

Having accepted the benefits of PJS's performance under the contracts, Tauck cannot now seek to avoid its payment obligations under those contracts.  As one leading commenter has explained:

> When there has been a material failure of performance by one party to a contract [PJS], so that a condition precedent to the duty of the other party's performance has not occurred, the latter party [Tauck] has the choice to continue to perform under the contract or to cease to perform and <u>conduct indicating an intention to continue the contract in effect will constitute a conclusive election</u>, in effect <u>waiving the right to assert that the breach discharged any obligation to perform</u>.

> In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform <u>does not apply when</u> the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.

> * * *

> If the obligor [Tauck], nevertheless, knowingly and voluntarily accepts the defective performance, fairness dictates that it should thereafter render any

> agreed return performance.  Although the obligor may
> still be entitled to damages for the defective
> performance, <u>it cannot escape the duty to perform</u> for,
> by outward manifestations indicating that the
> defective performance has been accepted, the obligor
> has sent the unmistakable signal - by conduct, rather
> than by an express promise - that <u>it still considers
> the contract to be binding</u>.

14 S. Williston & R. Lord, <u>Williston on Contracts</u> § 43:15, The

Effect of an Election to Proceed (4th ed. 2014) (emphasis

supplied).  <u>See also</u> <u>Avila v. CitiMortgage, Inc.</u>, 801 F.3d 777,

787 (7th Cir. 2015) (quoting that text); <u>AnywhereCommerce, Inc.

v. Ingenico Inc.</u>, 2023 WL 5804257 (D. Mass. July 14, 2023)

(citing that text).  <u>See generally</u> Restatement (Second) of

Contracts § 246 (1981) ("an obligor's acceptance or his

retention for an unreasonable time of the obligee's performance,

with knowledge of or reason to know of the non-occurrence of a

condition of the obligor's duty, operates as a promise to

perform in spite of that non-occurrence.").


    Plainly then, Tauck's conduct represented an indication

that it considered the contracts to be binding and PJS can

pursue a breach of contract claim against Tauck arising out of

the 2019 tour season.  What is unclear, however, is the precise

nature of that claim and the corresponding damages.  As far as

the court can discern, there are two possibilities.  The first

is this: PJS is correct and Tauck was obligated to operate at

least 50 tours <u>with</u> <u>PJS</u> using the dedicated ATR-72 or, when it
was unavailable, a comparable aircraft supplied by PJS.  If
Tauck failed to do so, it was obligated to pay PJS the "50-tour
minimum price."  For 2019, the contract minimum price was
$3,055,000.  That number, less any payments actually made by
Tauck, would represent PJS's damages.

A second possible interpretation of the contracts is this:
Tauck was obligated to operate a minimum of 50 tours annually in
New Zealand.  It was also obligated to use PJS-supplied
transportation <u>provided</u> the dedicated ATR-72 was available for
50 tours.  If that aircraft was not available, Tauck was free to
seek suitable air transportation for its guests through an
alternate carrier and those tours would count toward the 50-tour
minimum.  Under those circumstances, Tauck would be obligated to
pay PJS only for the tours actually operated through PJS, so
long as it operated a total of at least 50 New Zealand tours
(regardless of air carrier used).  In 2019, that means Tauck
would be liable to PJS for the cost of the 48 tours that PJS did
provide, since Tauck met the 50 tour minimum.

To resolve that lingering dispute, the court must construe
the terms of the parties' contracts.  Under New Hampshire common
law, "as a general rule, the proper interpretation of a contract

is ultimately a question of law for [the] court, and [it] will determine the meaning of the contract based on the meaning that would be attached to it by reasonable persons.  In interpreting the terms of the contract, [the court] will consider the objective intent of the parties at the time the contract was made."  Gamble v. Univ. Sys. of New Hampshire, 136 N.H. 9, 13 (1992) (citations and internal punctuation omitted).  See also Matter of Liquidation of Home Ins. Co., 166 N.H. 84, 88 (2014) ("When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole.") (citation omitted).

The relevant terms of the contracts at issue provide as follows:

> **Contract Minimum (Guarantee):** Tauck must guarantee a minimum of 50 tours per year.  In the event of a shortfall in the number of tours **operated** in any Season, Tauck will pay to Supplier the 50-tour minimum price for the applicable Season as set forth on Table 1 of this Agreement.
>
> By way of example, if Tauck **operates** 48 tours in the 2020 Season, Tauck will owe Supplier an additional payment of $125,866 (50 tour minimum less 48 tours operated = 2 tour penalty x USD $62,933 per tour = USD $125,866).

Statement of Work (document no. 77-4), Section 10 (emphasis

supplied).

> **Contingency Management & Interruption**. PJS' policy is
> to always have a minimum of two contingency plans in
> place for every flight to quickly recover from a
> mechanical, weather, or other Force Majeure. . . .
> When unforeseen interruptions occur, PJS' dedicated
> client service team will work with Customer to analyze
> all contingency options available, and if necessary,
> to reposition the closest suitable aircraft. <u>PJS may
> arrange for alternative transportation only with the
> express written authorization from Customer</u>.
>
> <u>If the aircraft is unable to complete</u> any portion of
> the Itinerary due to adverse weather, operational, or
> mechanical reasons, Customer shall be notified
> immediately and PJS shall credit [i.e., "reimburse"]
> to Customer all proposed charges with respect to the
> canceled charter flight legs.  Flights **<u>operated</u>** on a
> delayed or subcontracted basis [i.e., through PJS]
> will not be credited.

Blanket Purchase Agreement (document no. 77-3), Section 20

(emphasis supplied).


     Fundamentally, the parties disagree as to the meaning of

the word "operate," as used in the Statement of Work, and how it

affects Tauck's obligation to use the ATR-72 (or alternate

aircraft) provided by PJS.  According to PJS, the contracts

obligate Tauck to "operate" a minimum of 50 tours each season

<u>using aircraft provided by PJS</u> – that is, the ATR-72 when it is

available, or comparable alternate aircraft offered by PJS when

it is not.  In PJS's view, it had no interest in how many tours

Tauck operated using third parties' aircraft; when the contracts were drafted, it sought to ensure that Tauck would use its services for a minimum of 50 tours each season so it could cover its substantial operating expenses. And, says PJS, because Tauck only "operated" 48 tours with PJS in 2019, it breached the contracts and is required to pay the "50-tour minimum price."

Tauck, on the other hand, interprets the contracts to mean that it was obligated to use the dedicated ATR-72 when it was available in a timely fashion. When that dedicated aircraft (for which it contracted) was not available in a timely fashion – whether for staffing, weather, or mechanical reasons – Tauck believes it was permitted to seek an alternate aircraft suitable for its clients. See BPA, Contingency Management & Interruption, Section 20. Moreover, says Tauck, any tours operated using a third party's aircraft and pursuant to Section 20 of the BPA must be counted toward the 50-tour annual minimum. Thus, says Tauck, it met its 2019 contractual obligation to "operate" a minimum of 50 tours by using the ATR-72 for the 48 tours that it was available and, when that aircraft was unavailable, by operating another 7 to 9 tours with Alliance Air (for a total of at least 55 tours that season). See e.g., Defendant's Memorandum (document no. 78-1), at 11 ("Stated clearly, PJS is not entitled to damages under the Contract

Minimum/Guarantee because Tauck operated more than 50 tours, thereby satisfying the requirement.").

Given the language employed in the parties' contracts, Tauck's interpretation is the rational and reasonable meaning that would be attached to the terms by reasonable people. Indeed, the language of the "Contingency Management & Interruption" section of the Blanket Purchase Agreement compels that conclusion.  That provision states that if the dedicated ATR-72 is not available for use by Tauck, Tauck is free to secure air transportation from a third party and, critically, the contracts do not compel Tauck to use alternate aircraft offered by PJS.  Here, PJS offered alternate aircraft, but Tauck elected to secure air transportation from a third party and PJS actually reimbursed (or at least credited) Tauck for the eight missed flights.  By vesting control with Tauck over which carrier (and which aircraft) it used when the dedicated ATR-72 was unavailable, and by omitting any language expressly stating that flights operated using a third party provider under those circumstances would not count toward the 50-tour minimum, the contracts contemplate that Tauck would operate a minimum of 50 tours each season with PJS provided the dedicated ATR-72 was available.  Had the parties intended that only tours using the ATR-72 or alternate aircraft provided by PJS would count toward

the 50-tour minimum, the contracts would have included such a
provision.  They do not.

Suppose, for example, that PJS had been unable to provide
the ATR-72 for the first 20 Tauck tours of the season and Tauck
operated a total of 50 tours that season – 30 with PJS and 20
with another carrier.  Tauck would hardly be responsible for
paying both the third party it necessarily hired to provide air
transportation suitable to its clientele for those 20 flights
and PJS for 20 flights it never furnished.  Had that been the
intent of the parties, Section 20 of the BPA would have included
language that either: (a) required Tauck to use whatever
alternate aircraft PJS provided (assuming, of course, it was
deemed "comparable" to the ATR-72 - presumably by Tauck); or (b)
expressly noted that, while Tauck was free to secure air
transportation from a third party when the ATR-72 was
unavailable rather than use alternates furnished by PJS, those
flights would not count toward the 50-tour contract minimum.
The contracts have no such language.

Tauck's interpretation of the contracts is that which a
reasonable person would adopt, and it met the 50-tour minimum
for the 2019 season.  That conclusion does not, however, end the
court's inquiry.  Even if Tauck was not obligated to operate 50

17

tours <u>with PJS</u> if the designated ATR-72 was unavailable, it did
conduct 48 tours with PJS during the 2019 season.  It must,
therefore, pay PJS for those 48 tours.

The Statement of Work establishes the rates that Tauck
agreed to reimburse PJS for each tour, depending upon the total
number of tours in any given season; the more tours Tauck
operated with PJS, the less PJS would charge it for each
individual tour.  For the 2019 season, the parties agreed to the
following fee schedule, with a "base charter rate" or "top tier
billing rate" of $61,000 per tour:

| Number of Departures | 2019 Charter Rate |
|---|---|
| 65-70 | $53,020 |
| 61-65 [sic] | $55,100 |
| 55-60 | $58,100 |
| 50-54 | $61,100 |

SOW, at 4, Table 1.

All agree that Tauck operated 48 tours with PJS in 2019.
So, pursuant to the terms of the SOW, it was obligated to pay
PJS the base charter rate of $61,100.00 for each of those 48
tours.  It did not.  Instead, because Tauck had originally
planned to operate a total of 72 tours that season, it was
billed at the discounted rate of $58,100 per tour.  In essence,
Tauck was given a $3,000 volume discount per tour, in

anticipation of it actually operating significantly more than 50
tours with PJS.  Of course, those additional tours never
materialized.  And the difference between what Tauck was billed
(and presumably paid) and what it actually owes under the
contract amounts to a difference of $3,000 per tour.
Consequently, Tauck owes PJS a total of $144,000 for the 2019
season: that is, 48 flights times the $3,000 underpayment per
flight.  See SOW, at 4, Table 1.  See also SOW at para. 7(a)
("The rate to be charged at time of departure each year will be
based on the mutually agreed projected number of departures at
the beginning of each season [and] any adjustments due to lower
or higher departure tiers will be paid/refunded prior [to] the
October 1 payment of each year.").

    But, says Tauck, PJS has overstated its damages.  In
support of that claim, it points to Section 10 of the Statement
of Work (quoted above), which provides an example in which
(coincidentally) Tauck operates only 48 tours in the 2020 season
and explains that PJS's damages would be limited to $125,866.
See Defendant's Memorandum (document no. 78-1) at 12.  Applying
the rationale of that example for the 2019 season, PJS's damages
would be $122,200 - that is, $61,100 base charter rate per tour
times two missed tours.  But, of course, that example
contemplates that Tauck had paid the full base charter rate for

each of the 48 tours actually operated through PJS ($61,100 per
tour).  It did not.  As explained above, Tauck was billed at a
discounted rate ($58,100 per tour) for those 48 tours in
anticipation of it actually operating significantly more.
Because those additional tours operated through PJS did not
materialize, Tauck was not eligible for the discounted rate and
it is liable for payment of the full base charter rate of
$61,100 per tour for each of the 48 tours operated in 2019.  See
SOW at para. 7(a).


    Accordingly, PJS' motion for summary judgment as to Count
One of its complaint is granted in part.  Pursuant to the terms
of the parties' contracts, Tauck owes PJS a total of $144,000.00
for the 2019 tour season.


II.  Count Two - The 2020 Tour Season.

    In 2020, Tauck's ability to conduct its tours in New
Zealand was thwarted by the global COVID-19 pandemic.  From
January 1 through March 19, 2020, Tauck operated, and PJS
arranged air travel for, 23 tours in New Zealand.  Tauck was
billed $1,447,459 for those services.  On March 20, 2020,
however, New Zealand closed its borders to foreign travelers
through (and well beyond) the remainder of that year.  At that
point, Tauck was unable to operate any of its remaining 2020

tours in New Zealand and all were cancelled.  As a result, says
Tauck, it refunded nearly $5 million to customers who had
prepaid for trips to New Zealand.

Given those circumstances, PJS and Tauck attempted but were
unable to resolve their relative obligations under the
contracts, nor were they able to amend the contracts to each
party's satisfaction.  On May 28, 2020, Tauck invoked the
"Adverse Economic Conditions" provision contained in the
Statement of Work and cancelled the parties' contracts in their
entirety.  See Letter from Tauck to PJS dated May 28, 2020
(document no. 77-23).  Under the terms of the Statement of Work
and, in particular, the Adverse Economic Conditions provision,
the contracts between the parties would terminate at "the end of
the [2020] season" and, absent legal excuse, Tauck remained
obligated to pay PJS "for all flights flown" as well as all
other obligations for which "Tauck is otherwise committed to by
this Agreement."  SOW, Section 6, at 3.  That, says PJS, means
Tauck still must honor (and pay for) its guarantee of a minimum
of 50 tours for the 2020 season, notwithstanding Tauck's
inability to actually operate those tours.  And, because Tauck

operated only 23 tours in 2020, PJS says it is entitled to
payment for the remaining 27 tours it was promised.[1]

Tauck concedes that it may not seek to escape its
contractual liability by invoking the contracts' Force Majeure
provisions.  See, e.g., Defendant's Memorandum in Opposition
(document no. 78-1) at 3.  Nevertheless, Tauck contends that
neither it nor PJS ever contemplated the scope and duration of
the pandemic's economic impact.  Nor, more specifically, did
either party imagine that New Zealand would close its borders to
all non-citizens – a first in the country's history.
Consequently, says Tauck, it may properly invoke the common law
contract doctrines of impossibility and frustration of purpose
to discharge its obligations under the contracts, thereby
excusing performance of its commitment to operate 50 tours in
the 2020 season.

When the parties filed their original motions for summary
judgment, PJS embraced the view that because the terms of the
amended Force Majeure clause protect only PJS, they implicitly

---

[1]    Unlike its claims in Count One, PJS does not assert that
Tauck paid less than the full amount owed for each of the 23
tours actually operated in 2020.  It seems that Tauck was billed
$1,447,459 for 23 tours, or $62,933 per tour.  That is the "top
tier" pricing for 2020 under the Statement of Work.  So, there
is no doubt that Tauck was billed (and presumably paid) the full
amount owed for the 23 tours actually operated in 2020.

(but not explicitly) assign the risk of adverse events
materially affecting contract performance related to epidemics
and the exercise of civil authority to Tauck.  The parties
actively negotiated the language of the Force Majeure clause
(Tauck even suggested that PJS include protection from
"epidemic" events).  So, in PJS's view, Tauck could have
contractually protected itself from Force Majeure events, but it
did not.  Consequently, said PJS, by agreeing to the Force
Majeure clause that extended protection exclusively to PJS,
Tauck implicitly accepted all risks associated with the events
described in that provision – which include "Acts of God, events
of nature, epidemics, and civil or military authority" – and
waived the common law defenses of impossibility and frustration
of purpose.

     When PJS first raised that argument it was unclear whether,
under New Hampshire law, by agreeing to the Force Majeure clause
as written, Tauck implicitly waived otherwise available contract
defenses.  That is to say, whether a Force Majeure clause
protecting just one of the parties necessarily allocates (by
implication) the risks of such identified events to the other
party to the extent of depriving that party of otherwise
available contract defenses, like impossibility of performance
or frustration of purpose.  To resolve that critical issue of

state law, the court certified the question to the New Hampshire

Supreme Court.  See Certification Order, Sept. 30, 2022

(document no. 58).


     In April of 2024, the New Hampshire Supreme Court issued

its response, holding that:


          [T]he common law contract defenses of impossibility,
          impracticability, and frustration of commercial
          purpose are so fundamentally related to contract
          formation and purpose that they remain viable unless
          expressly waived.  Accordingly, a force majeure clause
          that protects only one party to a contract should not
          be deemed, in and of itself, a relinquishment of the
          other party's right to interpose those common law
          defenses.

Priv. Jet Servs. Grp., LLC v. Tauck, Inc., 176 N.H. 553, 555

(2024) (emphasis supplied).  So, because Tauck did not expressly

waive its common law contract defenses, they remain available to

it.


     In its motion for summary judgment on Count Two, Tauck

focuses first (and primarily) on the common law doctrine of

impracticability/impossibility.  The Court of Appeals for the

Second Circuit has explained that doctrine as follows:


          In general impossibility may be equated with an
          inability to perform as promised due to intervening
          events, such as an act of state or destruction of the
          subject matter of the contract.  The doctrine comes
          into play where (1) the contract does not expressly

allocate the risk of the event's occurrence to either
party, and (2) to discharge the contractual duties
(and, hence, obligation to pay damages for breach) of
the party rendered incapable of performing would
comport with the customary risk allocation.
Essentially, then, discharge by reason of
impossibility - as well as the concomitant remedy (to
the discharge) of rescission - enforces what can
reasonably be inferred to be the intent of the parties
at the time of contract.

United States v. Gen. Douglas MacArthur Senior Vill., Inc., 508

F.2d 377, 381 (2d Cir. 1974) (emphasis supplied).  Similarly,

the Restatement (Second) of Contracts provides that:

> Where, after a contract is made, a party's performance
> is made impracticable without his fault by the
> occurrence of an event the non-occurrence of which was
> a basic assumption on which the contract was made, his
> duty to render that performance is discharged, unless
> the language or the circumstances indicate the
> contrary.

Restatement (Second) of Contracts, § 261 (1981).[2]  See also Perry

v. Champlain Oil Co., 99 N.H. 451, 453 (1955) (discussing the

doctrines of "commercial frustration" and "impossibility").

---

[2]    "Although the rule stated in this Section is sometimes
phrased in terms of 'impossibility,' it has long been recognized
that it may operate to discharge a party's duty even though the
event has not made performance absolutely impossible.  This
Section, therefore, uses 'impracticable,' the term employed by
Uniform Commercial Code § 2-615(a), to describe the required
extent of the impediment to performance."  Restatement (Second)
of Contracts, § 261 comment d.

The Restatement goes on to state that, "If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."  Restatement (Second) of Contracts, § 264 (1981).  In other words, "It is a basic assumption on which the contract was made that the law will not directly intervene to make performance impracticable when it is due.  Therefore, if supervening governmental action prohibits a performance or imposes requirements that make it impracticable, the duty to render that performance is discharged, subject to the qualifications stated in § 261."  Id., comment a (emphasis supplied).

PJS contends that the parties specifically contemplated that both "epidemics" and "travel advisories of the Department of State" might impede performance under the contracts and, through the Force Majeure provision, protected PJS – but not Tauck – should such conditions arise.  See Plaintiff's Memorandum (document no. 77-1) (citing Statement of Work, para. 5).  So, because the parties anticipated such events and allocated the risks associated with those events, PJS says Tauck cannot avail itself of the common law defense of impracticability/ impossibility.

26

Notwithstanding PJS's suggestions to the contrary, as both
a factual and legal matter, see Restatement (Second) of
Contracts, § 264, comment a, the parties did not contemplate,
and could not have reasonably contemplated at the time of
contract formation, that the New Zealand government would close
its borders to all foreigners for more than two years because of
a world-wide pandemic.  Stated slightly differently, that New
Zealand's borders would remain open to foreign tourists was a
basic assumption upon which the parties' contracts were based.
That unforeseen governmental action made it impossible for Tauck
to conduct its planned tours of New Zealand.  Most obviously,
Tauck could not transport its clients into New Zealand.  And,
absent that ability, Tauck was prevented from operating any
tours for the entirety of New Zealand's border closure and was
unable to derive any benefit from its bargain with PJS.[3]

But, says PJS, the Adverse Economic Conditions clause
pursuant to which Tauck cancelled the contracts specifically

---

[3]    Parenthetically, the court notes that it is entirely
unclear whether even PJS could have performed its own
obligations under the contracts in light of New Zealand's border
closure and related COVID-19 restrictions.  For example, PJS has
not shown that it could have provided the necessary flight
crews, maintenance crews, ground crews, catering services, etc.
– all of which were essential to its performance under the
contracts.

provides that, "Nothing contained in this Agreement shall be construed as to relieve Tauck from its obligation to pay Supplier for all flights flown <u>or which Tauck is otherwise committed to by this Agreement</u>."  Statement of Work, para. 6 (emphasis supplied).  Consequently, PJS asserts that despite Tauck's earlier cancellation of the contracts, it remains obligated to PJS for the unpaid balance of the annual guaranteed contract minimum of $3,146,650.  Indeed, says PJS, <u>that</u> performance under the contract – Tauck's obligation to make an annual minimum payment - has been completely unaffected by the New Zealand border closure and the doctrine of impossibility or impracticability does not operate to relieve Tauck of that payment obligation.  PJS misconstrues the applicability, scope, and effect of the doctrine of impossibility or impracticability.

Had Tauck simply invoked the Adverse Economic Conditions clause as a result of a market correction and cancelled the contracts on that basis, PJS's point might be well taken.  Under those circumstances (and absent the additional material facts related to New Zealand's border closure), Tauck's obligation to pay the annual 50-tour minimum price would, as the parties plainly agreed, survive Tauck's decision to cancel the contracts.  Here, however, more than simply a market correction was at play.  New Zealand closed its borders to foreigners and

prevented Tauck from operating its planned tours.  That
government action was unanticipated by the parties and Tauck has
properly interposed the common law defense of impossibility or
impracticability to discharge all of its 2020 obligations under
the contracts – that is, in essence, avoidance or rescission of
the contracts in their entirety.  See Gen. Douglas MacArthur
Senior Vill., Inc., 508 F.2d at 381 (noting that rescission is a
"concomitant remedy" to discharge under the doctrine of
impossibility or impracticability).  See also Brodnik v. Cottage
Rents LLC, 209 N.E.3d 1200, 1203–04 (Ind. Ct. App. 2023) ("Under
Florida law, rescission or cancellation of a contract may be
obtained on the ground of impossibility of performance.
'Impossibility of performance' refers to those factual
situations where the purposes for which the contract was made
have, on one side, become impossible to perform."); RW Holdings,
LLC v. Mayer, 131 A.D.3d 1228, 1230, 17 N.Y.S.3d 171, 173 (2015)
(noting that a contract may be rescinded based upon
impossibility of performance); YPI 180 N. LaSalle Owner, LLC v.
180 N. LaSalle II, LLC, 403 Ill. App. 3d 1, 2–3, 933 N.E.2d 860,
862 (2010) (same).[4]

---

[4]    Additionally, Tauck's obligation to pay the 3,146,650 50-
tour minimum amount for 2020 is discharged by the doctrine of
frustration of commercial purpose.  See 30 S. Williston & R.
Lord, Williston on Contracts § 77:112, The Effect of Failure as
Justified by Frustration of Commercial Purpose (4th ed. 2014)
("The frustration of purpose doctrine is applicable when after a

In short, then, Tauck is entitled to invoke the common law defense of impossibility or impracticability to discharge its 2020 obligations under the contracts – even those that purport to survive contract cancellation under the Adverse Economic Conditions clause.  This point was made clear by the Indiana Court of Appeals in an analogous case.  <u>See</u> <u>Brodnik v. Cottage Rents LLC</u>, 209 N.E.3d 1200 (Ind. Ct. App. 2023).  In <u>Brodnik</u>, the plaintiff prepaid $6,000 to rent a Florida vacation home through the defendant, a vacation rental company.  A few weeks before plaintiff's rental was to begin, the COVID-19 pandemic emerged.  Then, five days before plaintiff's planned arrival in Florida, the governor issued an executive order that prohibited all but essential travel throughout the state.  When the rental agent refused to refund his prepayment, the plaintiff filed suit in Indiana.

---

contract is made, a party's <u>principal</u> <u>purpose</u> is substantially frustrated without that party's fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made.  The main thrust behind the doctrine of frustration of purpose is to excuse a party from performing under a contract on the occurrence of an intervening or supervening condition that substantially frustrates the main purpose for which the parties entered into the contract in the first place.  Under the doctrine of commercial frustration, a contract is to be considered subject to the implied condition that the parties will be excused in case, before breach, the state of things constituting the fundamental basis of the contract ceases to exist without default of either of the parties.").

At trial, the parties agreed that the executive order prohibited the plaintiff from traveling to the Florida vacation home he had rented.  Given that, the plaintiff argued he was entitled to a refund because the contract was unenforceable under the common law doctrine of impossibility.  The defendant disagreed, asserting that plaintiff could have received a refund under the contract (less a $250 service fee) if: (a) the plaintiff had given written notice of cancellation (which he failed to do); and (b) the defendant had been able to re-rent the property (which it claimed it likely could have done).  In defendants view, then, the doctrine of impossibility was inapplicable and, having failed to give the required written notice of cancellation pursuant to the contract's terms, plaintiff was not entitled to a refund.  The court disagreed, concluding that "the Executive Order made it impossible for Vacationer to derive any benefit from the bargain" and it was an "unforeseeable supervening event that radically altered the world in which the parties were expected to fulfill their promises."  Brodnik v. Cottage Rents LLC, 209 N.E.3d 1200, 1204-05 (Ind. Ct. App. 2023).  The court then held that, "because the doctrine of impossibility applies, [plaintiff] may avoid the contract, including all provisions concerning cancellation."  Id. at 1205.

Finaly, the court explained why the contract's provisions –
including those governing cancellation – could not be enforced
against the plaintiff.

> In applying the doctrine of impossibility, the dissent
> looks to the cancellation provisions in the contract.
> Yet those provisions formed part of an overall bargain
> for the rental of a Florida vacation home - a deal
> struck in May 2019 with the basic understanding
> Vacationer could lawfully enjoy the "Salt Air Cottage"
> in March 2020.
>
> Unforeseeably, the tide changed; the pandemic led to
> an Executive Order prohibiting interstate travel.  In
> other words, "the real world in some way failed to
> correspond with the imaginary world hypothesized by
> the parties to the contract."  That is why the
> doctrine of impossibility applies here, permitting
> Vacationer to rescind the contract regardless of any
> ancillary term contained in the bargain; the
> foundation unforeseeably shifted, resulting in
> "changes, unbargained for and radical, that make
> enforcement of the bargain unwise."  Id.

Brodnik, 209 N.E.3d at 1204 n.2 (quoting Cook v. Deltona
Corp., 753 F.2d 1552, 1558 (11th Cir. 1985)). (emphasis
supplied).


Here, Tauck does not seek relief from its contractual
obligations pursuant to the Adverse Economic Conditions
clause (or any other clause) of the contracts.  Instead, it
seeks to discharge all obligations under those contracts
for the 2020 tour season - including those that purportedly
survive contract cancellation - based upon application of

32

the common law doctrine of impossibility or

impracticability.  Because it has shown that there are no

genuinely disputed material facts and it has demonstrated

that it is, as a matter of law, entitled to application of

that common law defense, Tauck is entitled to discharge of

its obligations under the contracts for the 2020 tour

season.  Consequently, it is not liable to PJS for the

unpaid balance of the 2020 contract minimum of $3,146,650

and its motion for summary judgment as to Count Two of

PJS's complaint is necessarily granted.[5]


### Conclusion

For the forgoing reasons, PJS's Motion for Summary

Judgment (**document no. 77**) is granted in part and denied in

part.  Similarly, Tauck's Motion for Summary Judgment

---

[5]    Parenthetically, the court notes that PJS asserts that
Tauck's ability to perform under the contracts was not,
technically speaking, rendered "impossible" by the New Zealand
border closure.  The government re-opened its borders in July of
2022 and at that point, Tauck could have (and, indeed, appears
to have) resumed its tours.  See Plaintiff's Memorandum
(document no. 77-1) at 18.  But, this dispute involves only the
2019 and 2020 tour seasons.  The contracts did not extend beyond
that period because Tauck invoked the Adverse Economic
Conditions clause and cancelled them as of the close of the 2020
season.  So, for purposes of this dispute, whether Tauck could
have resumed tours in the middle of 2022 (18 months after the
contracts were cancelled) is irrelevant.  Tauck's performance
under the contracts for the majority of the 2020 tour season was
rendered impracticable/impossible by the border closure, and its
obligations with respect to the 2020 tour season are discharged.

(**document no. 78**) is also granted in part and denied in part.  As to Count One of PJS's complaint (relating to the 2019 tour season), PJS is entitled to payment from Tauck in the amount of $144,000, plus applicable interest and costs. As to Count Two of PJS's complaint (relating to the 2020 tour season), Tauck is entitled to judgment as a matter of law and PJS is not entitled to any contract recovery from Tauck.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 3, 2025

cc:  Counsel of Record